HELEASCO SEVENTEEN, INC., a corporation of the State of Delaware, Plaintiff,

v.

Chester E. DRAKE and Carl E. Drake, Defendants.

Civ. A. No. 83–413–JLL.

United States District Court, D. Delaware.

Aug. 22, 1984.

Jeffrey S. Goddess of Saul, Ewing, Remick & Saul, Wilmington, Del., for plaintiff.

Ben T. Castle, Jack B. Jacobs and James L. Patton, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. FACTS

Presently before the Court in this diversity case is the motion of defendants, Chester E. and Carl E. Drake, pursuant to Fed. R.Civ.P. 60(b), to set aside a default judgment entered against them by the Clerk of this Court. (Docket Item ["D.I."] 11.) The chronology of events leading up to this motion may be summarized as follows: Plaintiff, Heleasco Seventeen, Inc. ("Heleasco"), on June 28, 1983, filed its complaint in this Court against the defendants as guarantors on a leveraged lease transaction.[1] Defendant, Chester, a citizen of Mississippi, received a copy of the complaint by first-class mail in early July, 1983.[2] Carl, a

---

1. Plaintiff employed two methods of service: (a) first-class mail pursuant to Fed.R.Civ.P. 4(c), and (b) registered mail, pursuant to the Delaware long-arm statute. 10 *Del.C.* § 3104.

2. In his answers to interrogatories, Chester E. Drake stated that he received the complaint in this case "Sometime in early July, 1983 ... by ordinary mail from some lawyer's office. (b) Approximately two weeks later, in mid-July, 1984, I received by registered mail ... a certified copy of the Complaint by certified mail." (D.I. 33 at 1–2.)

In Way's affidavit he claims that Chester Drake received a summons by registered mail

citizen of Louisiana, received by first-class mail a copy of the complaint on July 5, 1983. (D.I. 36 at 2.) Upon receipt of the complaint, Carl forwarded a copy to his attorney, Charles W. Dittmer. On July 6th, after discussing the complaint with Chester (Carl's father), Carl called Wren C. Way, Chester's attorney, who was going to handle Chester's defense. On July 7, 1983, Carl wrote to Wren Way outlining the facts and enclosing copies of pertinent documents. On that day, Carl also met with Dittmer to discuss the suit.

On or about July 16, 1983, Chester received by registered mail a certified copy of the complaint from the Secretary of State for the State of Delaware.

Chester then gave the summons and complaint to his attorney, Way.[3] On July 21, Carl, during a meeting with Dittmer, agreed that Dittmer would call Way and "[s]uggest requesting a delay to answer from Plaintiff's attorney while we associated local counsel." (D.I. 36 at 4.)

On July 28, 1983, Way first telephoned Jeffrey S. Goddess, Esquire, attorney for plaintiff Heleasco. (D.I. 14, Ex. A.) Although there are differences with respect to the specifics of the conversation, both attorneys agree that an extension of time for defendants was discussed and granted.[4]

On August 2, 1983, Way again telephoned Goddess after Carl had received a copy of the complaint by registered mail. (D.I. 36 at 4.) Way indicated that he would be taking a minor role in the litigation now that Chester's son, Carl, had been served.

Way indicated that the lead role would be taken by Carl's attorney, Dittmer.

After August 2, 1983, the record does not indicate any communication, contact or activity until August 19, 1983, when the plaintiff filed its request for default. Three days later, on August 22, 1983, the plaintiff moved for, and the Clerk of Court entered, a default judgment. (D.I. 9.) On August 26, 1983, unaware of the entry of the default judgment, Dittmer informed Carl that Delaware counsel, Ben T. Castle, had been retained. On August 30, 1983, Ben Castle unsuccessfully attempted to contact plaintiff's attorney by telephone. The following day, however, Castle and Goddess met through a chance meeting at which time Castle told Goddess of his retention by the Drakes and also said that he had received no documents and had no knowledge of the merits of the matter. Goddess offered to supply materials from his file, and also mentioned the default judgment.

On October 20, 1983, defendants filed their motion to set aside the default judgment. (D.I. 11.)

### A. Lack of Notice on the Application for Default Judgment

Defendants argue that the default judgment must be set aside because the defendants had made an informal appearance in the case and the plaintiff failed to give three days' notice of plaintiff's application for a default judgment in violation of Fed. R.Civ.P. 55(b)(2).[5] (D.I. 14 at 7.) Plaintiff

on or about July 16, 1983. (D.I. 14, Exhibit ["Ex."] A.)

3. In his answer to interrogatories, Chester Drake stated that after he gave the summons and complaint to his attorney, Charles did not talk to Way about the case "[B]ecause I was busy with my wife's needs in her illness and because I had left all matters pertaining to the case in the hands of my lawyer, my son and my son's lawyer," (D.I. 33 at 2.)

4. There is a dispute as to the length of the extension agreed upon. Goddess contends that the extension was only on behalf of Way's client, Chester Drake, that the extension was for two weeks and that Way was to confirm in

writing. (D.I. 42 at 3.) Way claims that the extension was for an indefinite period, on behalf of both defendants with no firm time for appearance of local counsel. (D.I. 14, Ex. A.)

5. Rule 55(b) states in pertinent part:
(b) *Judgment.* Judgment by default may be entered as follows:
(1) *By the Clerk.* When the plaintiff's claim against a defendant is for a sum certain or for a sum which can by computation be made certain, the clerk upon request of the plaintiff and upon affidavit of the amount due shall enter judgment for that amount and costs against the defendant, *if he has been defaulted for failure to appear* and if he is not an infant or incompetent person.

contends that defendants were not entitled to the notice requirements of Rule 55(b)(2) because defendants had failed to make any formal "appearance" in this action.

### 1. *Rule 55(b)(2) Appearance*

The first issue is whether or not the telephone exchanges between the parties' counsel constituted an "appearance" by defendants within the meaning of Rule 55(b)(2). Normally, an appearance is used to signify the overt act by a party involving some presentation or submission to the Court's jurisdiction. A defendant, however, need not respond directly to the complaint in order for his conduct to constitute an appearance. *See generally Charlton L. Davis & Co., P.C. v. Fedder Data Center, Inc.*, 556 F.2d 308 (5th Cir.1977). The appearance required by Rule 55(b)(2) has been broadly defined and it is not limited to a "formal" court appearance. *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 139 U.S.App.D.C. 256, 432 F.2d 689 (1970). An appearance may arise by implication from defendant's seeking, taking or agreeing to some steps or proceedings in the cause beneficial to himself or detrimental to plaintiff. *See* 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2686 (1973).

In *Lutomski v. Panther Valley Coin Exchange*, 653 F.2d 270 (6th Cir.1981), the plaintiffs moved for a default after the plaintiffs had granted two extensions by telephone to the defendants. Although the defendants were notified of the entry of default, they were not notified of the default judgment hearing. The court found that the defendants had made an appearance for purposes of Rule 55(b)(2) and that they were therefore entitled to the notice mandated by the rule. The court stated:

> Though it is true that defendants made no formal appearance and filed no papers, courts now look beyond the presence or absence of such formal actions to

examine other evidence of active representation. Several cases have held that informal contacts between parties may constitute an appearance. The contacts must "indicate the defaulting party intends to defend the suit." (Citations omitted.)

653 F.2d at 271.

In *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 139 U.S.App.D.C. 256, 432 F.2d 689 (1970), the court was informed that during the settlement negotiations, letters were exchanged between the attorneys for the parties. In these letters, defendant made its intention to defend the suit clear to plaintiff and plaintiff's counsel admitted that he knew defendant was prepared to contest the matter. As a result, the court found that the defendant had appeared in the action, because neither party was in doubt that the suit would be contested. *See also Hutton v. Fischer*, 359 F.2d 913 (3d Cir.1966) (court found that a single telephone call from defendant's counsel to plaintiff's counsel in which plaintiff's counsel agreed to the request by defendant's counsel for more time, sufficient to meet the appearance standard of Rule 55(b)(2)); *United States v. One 1966 Chevrolet Pickup Truck*, 56 F.R.D. 459 (E.D. Tex.1972) (court held that the defense attorney's filing with the I.R.S. of a claim to the property forfeited and a cost bond to transfer jurisdiction was sufficient notice of claimant's clear purpose to defend and sufficient to constitute appearance); *Press v. Forest Laboratories, Inc.*, 45 F.R.D. 354 (S.D.N.Y.1968) (in the third action commenced by plaintiff against defendants over a ten-year period, all involving a running dispute, the court found that the third action was an extension of the earlier cases and therefore the contacts in the third case between plaintiff's attorney and defendant's attorney were sufficient to constitute an appearance in the third action).

(2) *By the Court.* In all other cases the party entitled to a judgment by default shall apply to the court therefor; .... If the party against whom judgment by default is sought has appeared in the action, he ... shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application.
(Emphasis added.)

In the present case, although there is a dispute as to exactly what transpired during the two telephone conversations between Goddess and Way, both agree that the phone conversations took place. Way describes his first conversation with Goddess by stating:

> After a review of the pleadings, I contacted Jeffrey S. Goddess, Esquire, attorney for Heleasco Seventeen, Inc. in Wilmington. We touched briefly on the merits of the issue, but talked mainly with regard to service of process upon Carl E. Drake, a Co-Defendant, who was away from his residence, out-of-state on business. *I advised Mr. Goddess that Chester E. Drake had a meritorious defense and advised him that I would, as quickly as possible, secure local counsel in Wilmington after discussing the matter with Charles Dittmer, Esquire, attorney for Carl E. Drake.*

(D.I. 14, Ex. A at 1–2; emphasis added.) Way summarizes his two conversations with Goddess as follows:

> I feel that I had a firm understanding with Mr. Goddess that Mr. Ditmer [sic] and I were representing the Drakes and that we had a meritorious defense to the cause of action. *Mr. Goddess and I did not establish a firm time for obtaining counsel or filing responsive pleadings or motions.* The matter is quite complex, involving issues of jurisdiction and venue, contracts and guaranties, tax law, as well as other issues, and involves a substantial amount of alleged liability on the part of the Defendants. It will require considerable discovery and communication between me, Mr. Dittmer and local counsel.
>
> In conclusion, it was my firm understanding that we would be afforded a reasonable length of time to discuss the complex matter among ourselves, to contact competent, local counsel, and to file such answer or other responsive pleadings as proper in the premises.

(D.I. 14, Ex. A at 2.) Goddess describes his first conversation with Way *in part* in the following terms:

In the aforesaid conversation of July 28, *Mr. Way asked for an extension of time* on behalf of Chester Drake. I explained that he was already two days overdue under the terms of the Delaware Long-arm Statute, and explained how time is computed under 10 *Del.C.* § 3104. I attempted to secure a stipulation on jurisdiction, if only by letter, but Mr. Way would not consent to that, not wanting to take a position which might bind the parties before Carl Drake had technically competent counsel look at the various transaction documents and pleadings. The eventual arrangement made was that I gave Mr. Way a two-week extension (to August 12) and he was to write back in confirmation, so that I could at least have his letterhead. *It was understood that this requested extension would probably be followed by another request, once Carl Drake had been served and had secured counsel.* I expressly stated in the conversation that the two-week interval was selected so as to coincide with service upon Carl, which I had just attempted a second time several days earlier. I relayed to Way my concern that we not be strung along in the matter, and that *further extensions would probably require the appearance of Delaware counsel on behalf of the Drakes.*

(D.I. 42, ¶ 5; emphasis added.) Goddess describes his second conversation with Mr. Way as follows:

> On August 2, 1983, at 4:50 p.m., I was again called by Mr. Way. He advised that Carl Drake had returned to his home in New Orleans, had received suit papers, and had engaged New Orleans counsel, who would take the lead role in the litigation. He mentioned that the attorney was Charles W. Dittmer, Jr., and identified his firm. He further said that Dittmer was supposed to have an associate in Philadelphia, one Thomas Ruder, who would see to the matter of retaining Delaware counsel.
>
> In the August 2 conversation I asked Mr. Way why I had not yet received a letter from him confirming our earlier

conversation, and asked whether I would be receiving one in the near future. *He said contact would be coming from Mr. Dittmer, or possibly Delaware counsel. I recall saying that Delaware counsel could probably expect to receive a further extension from me,* but I was starting to become concerned over the possibility that we were engaged in a stalling process. I referred to my understanding that Carl Drake had earlier ratified his obligation, and that this might even be a no-contest situation, with the Drakes only seeking to draw us out as long as possible to rearrange their assets before filing bankruptcy. *To that, Mr. Way stated that although he could not take a firm or developed position on it, it appeared as though some of the document terms were tangled and defenses could be made. He also said that even if liability were conceded, there would appear to be a need for discovery and analysis of the damage components claimed.* At the same time, he also stated that he did not consider himself competent on tax matters of that nature. (D.I. 42, ¶ 8; emphasis added.)

 Based upon the two telephone conversations of July 28 and August 2, 1983, and the events surrounding them, this Court concludes that the defendants have demonstrated their intent to defend the suit. Both telephone conversations were initiated by the defendants' attorney, Way, after discussions with his clients. Way also conveyed to Goddess the problems the defendants were having due to the complexity of the case, the need for local counsel in Delaware, and the problems coordinating communications between two defendants and their attorneys. Under these circumstances, the Court further concludes that the defendants did make an "appearance" for purposes of Rule 55(b)(2) and as such, they were entitled to three days' prior notice of plaintiff's August 22, 1983 application for default judgment.[6]

### 2. *Failure To Give Notice*

Having concluded that the defendants had, in effect, entered an appearance prior to the entry of the default judgment, the Court now turns to defendants' contention that the default judgment is a nullity and should be set aside.

 Pursuant to Rule 55(b)(2), where a defendant has made an appearance, he is entitled to have the court exercise its discretion in granting or denying a default judgment. Rule 55(c) states:

> For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).

Rule 60(b) states:

> On motion and upon such terms as are just the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud ..., misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied ...; or (6) any other reason justifying relief from the operation of the judgment.

Defendants argue that this Court should set aside the default judgment pursuant to Rule 60(b) for two reasons. First, because defendants believed that the plaintiff had on July 28, 1983, granted an indefinite extension of time to file an answer, plaintiff's pursuit of a default judgment 4 days after the expiration of Carl's time to answer, and 24 days after the expiration of Chester's time to answer, without any notice to defendants violated that extension. Plaintiff's actions therefore constituted a mistake, which constitutes a ground for set-

---

**6.** Because this Court finds that the plaintiff's application for default should have been made pursuant to Rule 55(b)(2) and not Rule 55(b)(1), this Court need not reach defendants' second argument that the default judgment should be set aside because it is not for a "sum certain."

ting the judgment aside under Rule 60(b). Second, the default judgment should be set aside because plaintiff sought a default judgment without notifying the defendants. Hence, the plaintiff violated both the understanding previously reached, as well as the notice requirement of Fed.R.Civ.P. 55(b)(2).

In *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 245 (3d Cir.1951), the court stated that in passing upon default judgments Rule 60(b) should be "given liberal construction.... *Any doubt* should be resolved in favor of petition to set aside the judgment so that the cases may be decided on their merits." The Third Circuit followed that admonition in *Livingston Powdered Metals, Inc. v. N.L.R.B.*, 669 F.2d 133 (3d Cir.1982) (a case involving the entry of a de facto default judgment by the NLRB against an employer) and *Medunic v. Lederer*, 533 F.2d 891 (3d Cir.1976).

In *Farnese v. Bagnasco*, 687 F.2d 761 (3d Cir.1982), the court was faced with a default entry and not a default judgment. That court set forth three factors which should be considered in order to determine whether or not the entry of a default should be set aside. The Third Circuit, however, later determined that the same three factors set forth in *Farnese v. Bagnasco* should be applied in situations where there also is a default judgment. *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d 653, 656 (3d Cir.1982). The three factors are:

1. Whether the plaintiff will be prejudiced;

2. Whether the defendant has a meritorious defense; and

3. Whether culpable conduct of the defendant led to the default.

*Farnese v. Bagnasco*, 687 F.2d at 764; *see also Livingston Powdered Metals, Inc. v. N.L.R.B.*, 669 F.2d at 136; *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d at 244–45, 246.

### B. *Prejudice to Plaintiff*

■ The burden of establishing prejudice to the plaintiff resulting from setting aside the default judgment rests upon the plaintiff. *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d at 656–57. Plaintiff claims that "vacating the judgment here would increase the potential for fraud by means of the Drakes' spiriting away or arranging assets to avoid execution[7].... If this default judgment were vacated after the Drakes have been permitted to string things along for ten months, the already precarious lien position could be gravely damaged when seeking execution against these non-residents." (D.I. 41 at 24.)

In short, plaintiff claims that it is in a "precarious lien position" and that delay would worsen that situation. This claim is legally insufficient because "[d]elay in realizing satisfaction on a claim rarely serves to establish the degree of prejudice sufficient to prevent the opening [of] a default judgment entered at an early stage of the proceeding." *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d at 656–57.[8] Because the default judgment was entered at an early stage of the proceedings, and because plaintiff's only claim of prejudice is based

---

**7.** Plaintiff *alleges* that the potential for fraud would be increased if the judgment were vacated. However, plaintiff has failed to *show* that during the time in which the defendant failed to answer or to move for the opening of the default judgment, that the opportunity for fraud and collusion increased. In *Schartner v. Copeland*, 59 F.R.D. 653 (M.D.Pa.), *aff'd*, 487 F.2d 1395 (3d Cir.1973), the court found that an approximate one-month delay between the date the default judgment was entered and the date the defendants filed their motions to set aside the entry of the default, constituted no increased opportunity for fraud or collusion. *Compare Titus v. Smith*, 51 F.R.D. 224 (E.D.Pa. 1970) (court found wilful and deliberate failure

to respond for one year and 10 months between date default entered and filing of defendant's motion to set aside resulted in prejudice to plaintiff). In the present case, there were approximately two months between the date the judgment was entered and the filing of the motion to set it aside.

**8.** In *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d 653 (3d Cir.1982), defendants filed a Rule 60(b) motion to set aside a default judgment that had been entered nine months earlier. The court found that the nine-month delay created no prejudice and therefore granted the motion.

on the delay in the satisfaction of its judgment, plaintiff has failed to show that it will be prejudiced if the default judgment is vacated.

### C. *Meritorious Defense*

■ The next issue to be considered in seeking relief from a default judgment under Rule 60(b) is whether the allegations of defendant, if established at trial, would make out a meritorious defense. *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d at 244. "In considering whether the defendant adduces a meritorious defense, courts search for either a specific recitation of facts that support a 'reasonable showing' of a meritorious defense ... or at least a credible allegation that such a defense exists." *Gen. Tire & Rubber v. Olympic Gardens*, 85 F.R.D. 66, 69 (E.D.Pa.1979) (citation omitted). In this case, the defendants allege that the plaintiff misinterpreted the documents in dispute and that a correct interpretation of them would prove that the plaintiff has no claim at all against the defendants. Defendants argue that the four documents[9] involved in the instant dispute are each separate and distinct agreements among the parties. In its complaint, plaintiff argues that under the terms of the Lease and Bareboat Charter Party agreement between Drake Towing Co. and Heleasco, Drake Towing leased four barges from Heleasco. Plaintiff also alleges that defendants, as guarantors for the benefit of Heleasco of the obligations of Drake Towing under the Lease and Bareboat Charter Party Continuing Guaranty, are liable for the lost tax benefits that plaintiff has suffered and that would have been available had Drake Towing complied with its obligations. (D.I. 1 at 3.)

The Participation Agreement, signed by plaintiff and Drake Towing Co., Inc., contains a Tax Indemnification provision, by which Drake Towing agreed to indemnify plaintiff in the event plaintiff lost certain tax benefits. (D.I. 16, Ex. A, ¶ 7(c).) Plaintiff contends that Drake Towing's performance under the Tax Indemnification Clause was guaranteed by defendants when they signed the Lease and Bareboat Charter Party Continuing Guaranty. The defendants argue that no reference is made in the Guaranty to the Participation Agreement or to the Tax Indemnification payments required thereunder. Defendants also claim that the Guaranty refers only to payment of the Charter Hire, payment of other sums to be paid thereunder, and performance of all other covenants of the Charter Party. Therefore, because the Charter Party does not incorporate by reference Drake Towing's duties under the Participation Agreement, including the Tax Indemnification Clause therein, the duties imposed on defendants by the Guaranty through reference to the Charter Party do not include the duty to guaranty performance of the Tax Indemnification Clause.

As a result, the defendants conclude that their liability for the lost tax benefits is not expressly within the limits of the Guaranty, and that liability is not of such a character that it could be reasonably inferred that the parties intended to include it within the Guaranty.[10]

Because the defendants have advanced a specific recitation of facts concerning the content of the four documents in question, the Court is satisfied that defendants have alleged sufficient facts that, if established at trial, would make out a meritorious de-

---

9. Four documents are involved in the instant dispute, and they are as follows: the Participation Agreement (D.I. 16, Ex. A), signed on December 15, 1981, by Drake Towing Co., Inc., Citicorp Industrial Credit, Inc. ("Citicorp"), and plaintiff Heleasco Seventeen, Inc.; the Lease and Bareboat Charter Party (D.I. 16, Ex. B), signed on December 15, 1981, by plaintiff Heleasco Seventeen, Inc., and Drake Towing Co., Inc.; the Lease and Bareboat Charter Party Continuing Guaranty (D.I. 16, Ex. C), signed on December 31, 1981, by defendants Chester E.

Drake and Carl E. Drake; and the Assignment of Lease (D.I. 16, Ex. D), signed on December 31, 1981, by plaintiff Heleasco Seventeen, Inc., Drake Towing Co., Inc., and Citicorp.

10. Defendants also allege that they are not liable to plaintiff because plaintiff has assigned the benefits of the Guaranty to Citicorp, thereby giving plaintiff no standing to sue. (D.I. 14 at 25.)

fense. However, this Court does not at this time express a view on the merits of the defense but observes that, prima facie, the defendants appear to have a valid defense.

### D. *Culpable Conduct*

■ The third factor to be considered by this Court is whether or not the culpable conduct of the defendants led to the default. The test for whether the defendant's conduct is culpable is whether defendant acted "wilfully or in bad faith." *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d at 657. Although the plaintiff, in a rambling manner, attempts to show how the conduct of the defendants led directly to the default situation, this Court is satisfied none of the evidence proffered by the plaintiff amounts to "wilfulness" or "bad faith."

The affidavits and answers to interrogatories submitted by defendants demonstrate that, between the time of the commencement of this action and the entry of default, the defendants believed that they had a reasonable extension of time to secure local counsel and to prepare their answer. (D.I. 36, ¶ 3; D.I. 14, Ex. A.) Moreover, plaintiff's counsel, by his own account, contributed to the confusion surrounding defendants' extension of time to answer. Referring to his first conversation with Way, Goddess states that "[i]t was understood that this *requested extension* would probably be followed by *another request*, once Carl Drake had been served and had secured counsel." (D.I. 42, ¶ 5; emphasis added.) Also in the July 28th phone conversation, Goddess claims the following transpired: "I relayed to Way my concern that we not be strung along in the matter, and that *further extensions* would probably require the appearance of Delaware counsel on behalf of the Drakes." (*Id.*) Thus it appears that Goddess promised one further extension before local counsel was secured and further extensions after local counsel appeared. (*Id.*, ¶ 8.) In any event, it seems clear, even from Goddess' own account, that, at the very least, Goddess was afford-

ing defendants "a reasonable length of time to discuss the complex matter [of this lawsuit] among ourselves, to contact competent, local counsel, and to file such answer or other responsive pleadings as proper ...." (D.I. 14, Ex. A at 2–3.)

Thus, plaintiff has failed to demonstrate that defendants' culpable conduct led to entry of default.

## II. CONCLUSION

■ When these three criteria are met, it is an abuse of discretion not to set aside a default judgment. *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d at 658. Furthermore, this test is "construed liberally, for default judgments are regarded with disfavor. Doubts are resolved in favor of removing default judgments because resolution on the merits best serves justice. The question is addressed to the broad sound discretion of the Court." *General Tire & Rubber Co. v. Olympic Gardens, Inc.*, 85 F.R.D. 66, 68–69 (E.D.Pa.1979) (citations omitted). Additionally, matters involving large sums of money should not be decided by default judgment if it can be reasonably avoided, particularly where there appears to be real issues of fact. *Henry v. Metropolitan Life Ins. Co.*, 3 F.R.D. 142 (W.D.Va.1942).

Consequently, the Court finds that defendants made an "appearance" within the meaning of Fed.R.Civ.P. 55(b)(2) and therefore they were entitled to three days' prior written notice of the application for default judgment. Inasmuch as the plaintiff failed to give such notice to the defendants and because all three criteria for granting a motion to set aside a default judgment pursuant to Rule 60(b) have been met, this Court will enter an order vacating the default judgment entered against the defendants on August 22, 1983.

An order will be entered in accordance with this memorandum opinion.